UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Alford Johnson, as Trustee
of the Martha Wood Trust

       v.                             Civil No. 11-cv-459-JD
                                        Opinion No. 2013 DNH 127

The Capital Offset Company, Inc.,
Jay Stewart, Stephen Stinehour,
and Acme Bookbinding Company, Inc.

O R D E R

Alford Johnson, as the trustee of the Martha Wood Trust,
brought suit against The Capital Offset Company, Inc.; its
president, Jay Stewart; a consultant who later worked for Capital
Offset, Stephen Stinehour; and Acme Bookbinding Company, alleging
claims arising from the publication of a photography book,
Spiritual Passports.[1]  Acme moves for summary judgment on the
remaining claims Johnson brings against it and on Capital
Offset's cross claims for contribution and indemnification.[2]
Johnson and Capital Offset object.

---

[1]Capital Offset's third-party claims against Susan Cox have
been resolved on summary judgment.

[2]Johnson's negligence claim against Acme in Count III was
previously dismissed.

I.   <u>Motion for Summary Judgment on Johnson's Claims</u>

Johnson's remaining claims against Acme are for negligent and intentional misrepresentation and violation of the New Hampshire Consumer Protection Act.  In opposing summary judgment, Johnson contends that Acme misrepresented that it was qualified and possessed the necessary skills, experience, and equipment to bind <u>Spiritual Passports</u> as the parties had agreed.  Johnson also contends that Acme violated the New Hampshire Consumer Protection Act by representing that it had the ability to bind <u>Spiritual Passports</u> properly.

A.   <u>Expert Witness</u>

As part of its motion for summary judgment, Acme challenges the qualifications of Johnson's expert witness, Donald P. Mazzella, to give opinions about the binding of <u>Spiritual Passports</u>.  Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the testimony will assist the trier of fact, has a sufficient factual basis, and is reliable.  Fed. R. Evid. 702.  "The proponent of the evidence bears the burden of demonstrating its admissibility."  <u>United States v. Tetioukhine</u>, --- F.3d ---, 2013 WL 3836263, at *4 (1st Cir. July 26, 2013).

2

Acme cites parts of Mazzella's deposition to show that he is not qualified to give opinions on bookbinding.  Mazzella stated that he was not an expert in bookbinding; that he knew more about publishing than bookbinding; that he did not know if Acme should have used different machinery; that Paul Parisi, President of Acme, was the expert in bookbinding; and that if Parisi thought the proposed alternative method for binding <u>Spiritual Passports</u> would work, Mazzella would go along with that opinion.

In response, Johnson cites Mazzella's later testimony in his deposition.  There, Mazzella stated that he had sufficient experience in the publishing industry to know whether a book was properly bound.  With respect to <u>Spiritual Passports</u> specifically, Mazzella stated that he had shown the book to people at a "print expo" in Chicago and that they said "the same thing," apparently meaning that the book was not properly bound. Mazzella further testified that although he lacked expertise in how a book is actually bound, his experience was sufficient to support an opinion about the adequacy of the binding.

In his expert report, Mazzella stated that he has been "involved in the communications industry for 50 years and specifically with print related products for 47 years."  Doc. 87-19.  His experience is that he has written, produced, and reviewed books and periodicals.  After reviewing copies of

3

<u>Spiritual Passports</u>, Mazzella concluded that the books "do not meet the threshold of acceptable printing and binding of a high-quality publication designed for table top display or as a treasured book." <u>Id.</u>  The specific defects that Mazzella notes are problems with printing, such as ink ratio, density, coverage, and spillover.

Based on the cited portions of Mazzella's deposition testimony, he lacks the scientific, technical, or specialized knowledge that would allow him to give opinions about the methods and technical processes of bookbinding.  Johnson relies heavily on Mazzella's opinions that a book bound without glue traps was "like a time bomb" and that eventually all of the bindings would fail but provides no showing that Mazzella has sufficient technical or specialized knowledge to support those opinions. Therefore, for purposes of this motion only, Mazzella lacks sufficient qualifications to express an opinion about how <u>Spiritual Passports</u> should have been bound and about whether Acme misrepresented its ability to bind <u>Spiritual Passports</u>.


B.  <u>Standard of Review</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(a).  In deciding a motion for summary judgment, the court draws "all reasonable inferences in favor of the non-moving party while ignoring conclusory allegations, improbable inferences, and unsupported speculation."  Pruco Life Ins. Co. v. Wilmington Tr. Co., 721 F.3d 1, 6-7 (1st Cir. 2013) (internal quotation marks omitted).  "A genuine issue is one that can be resolved in favor of either party, and a material fact is one which has the potential of affecting the outcome of the case."  Jakobiec v. Merrill Lynch Life Ins. Co., 711 F.3d 217, 223 (1st Cir. 2013).

C.  Background

In January of 2009, Johnson, as trustee of the Martha Wood Trust, hired Capital Offset to produce a book of photographs that had been taken by Johnson's wife, Martha Wood, shortly before her death.  Capital Offset hired Acme to bind the book, which was approved by Johnson.  At the end of the process, Johnson was not satisfied with the printing and binding of Spiritual Passports.

Johnson hired Susan Cox to work with him on the concept, design, and production of Spiritual Passports.  Cox's associate, Frank Biancalana, also worked with Cox on the project.  Johnson also hired Steven Stinehour to serve as a printing and production consultant for the project.

Acme was not considered initially to bind the book because it lacked the necessary equipment for a book with the dimensions of Spiritual Passports.  Acme then decided to acquire the necessary equipment.  The new pieces of equipment, known as a "Sticker" and a "Smasher," work together to apply glue to the end papers of each book and adhere the end paper to the cover board.

Cox did not want Spiritual Passports to be the first book bound with the new equipment and made that requirement clear to Acme.  For that reason, Cox was concerned about when the new equipment would arrive and that the equipment would be used before it was used in binding Spiritual Passports.  Acme assured Cox that Spiritual Passports would not be the first book bound using the new equipment.

Cox contends that Acme and Capital Offset misrepresented the arrival date for the new equipment.  The Sticker and Smasher equipment did arrive before the binding began for Spiritual Passports.  Further, according to Paul Parisi, president of Acme, many other books were bound using the new equipment before the equipment was used for Spiritual Passports.

Acme recommended that Capital Offset print the pages for Spiritual Passports with "glue traps," meaning uninked space on each page which would allow the glue to better adhere to the pages.  When Acme received the pages for binding, however, they

6

did not include glue traps.  Acme had previously bound books without glue traps and bound seven sample copies of <u>Spiritual Passports</u> with the pages provided by Capital Offset.

Johnson found that the bindings were too fragile, however, and Johnson and Biancalana discussed different binding methods with Parisi.  Acme then obtained a new glue, sanded the first and last pages of the books to remove the ink, and used double-sided tape to solve the binding problems.  Johnson, Cox, and Biancalana were not persuaded that the changes Parisi suggested would solve the binding problems.

To test Parisi's alternative binding method, Cox instructed Acme to bind a number of books for Johnson to distribute at a family party.  Acme states that it is unclear whether the alternative binding method was used on those books.  Johnson testified that most of the books distributed at the party began falling apart because of binding issues.

Cox, however, told Stinehour that everyone loved the books at the party, and she gave the "go ahead" to have more books bound.  Stinehour relayed the "go ahead" to Parisi at Acme for fifty more books.  On November 3, 2009, Stinehour told Parisi to bind the rest of the books using the same method as for the previous fifty books.  Acme shipped 960 copies of <u>Spiritual Passports</u>, that were bound with the sanding, new glue, and tape

7

method, to the University of Texas Press for distribution.
Because of defects in the books, many were returned, and sale of
the books was suspended.

Cox testified that of the books she received in January of
2010 few were acceptable.  Cox also testified that she reviewed
the books sent to the University of Texas press and found most of
them to be unsaleable.  Jay Stewart, the president of Capital
Offset, agreed that the books had printing and binding problems.

During his deposition, Parisi agreed that the books he was
shown had problems with the bindings and were not in a condition
to be sold.  He testified that a glue trap on the pages would
have alleviated the binding problems.  Parisi explained that the
alternative binding method Acme used, sanding, new glue, and
tape, was only done on the end papers, not every page in each
book.  Therefore, the alternative method did not solve the
binding problem.

D.  <u>Discussion</u>

In support of its motion for summary judgment on Johnson's
claims, Acme contends that Johnson cannot prove the elements of
either negligent or intentional misrepresentation.  Acme also
contends that Johnson cannot prove that Acme violated the New

8

Hampshire Consumer Protection Act.  Johnson opposes summary
judgment on all three claims.

    1.  Negligent Misrepresentation

    Under New Hampshire law, the elements of a negligent
misrepresentation claim are "a negligent misrepresentation of a
material fact by the defendant and justifiable reliance by the
plaintiff."  Wyle v. Lees, 162 N.H. 406, 413 (2011).  Negligence
is based on "the duty of one who volunteers information to
another not having equal knowledge, with the intention that he
will act upon it, to exercise reasonable care to verify the truth
of his statements before making them."  Id.  A misrepresentation
is made when a defendant knew or should have known that his
statements were false.  Id.  In addition, the misrepresentation
must have caused the plaintiff harm or injury, or stated in other
terms, the plaintiff must have reasonably relied on the
misrepresentation to his detriment.  See id.; Snierson v.
Scruton, 145 N.H. 73, 78 (2000); BAE Sys. Information & Elecs.
Sys. Integration Inc. v. SpaceKey Components, Inc., 2011 WL
5040705, at *14 (D.N.H. Oct. 24, 2011).

    For purposes of summary judgment, Johnson contends that Acme
negligently misrepresented that it would receive the new
equipment in time to use it in binding other books before it was

used to bind <u>Spiritual Passports</u> and misrepresented that it could bind <u>Spiritual Passports</u> with the pages it received from Capital Offset.  The two issues are addressed separately.

     a.  <u>New equipment.</u>

Johnson asserts that Acme represented that it would receive the new equipment that was necessary to bind a book the size of <u>Spiritual Passports</u> with sufficient time to test the equipment on other books.  Johnson contends that Acme's representation was false because the equipment had not yet arrived when Cox was at Capital Offset during the printing of <u>Spiritual Passports</u> and because Acme employees told Cox that they were getting the new equipment for the <u>Spiritual Passports</u> project.  From those circumstances, Johnson infers that the new equipment did not arrive in time to test it on other books before using it on <u>Spiritual Passports</u>.  Johnson states that Acme would not have been chosen to do the binding without the new equipment.

Parisi testified in his deposition that other books were bound using the new equipment before <u>Spiritual Passports</u> was bound.  Johnson's inference that <u>Spiritual Passports</u> was the first book bound using the new equipment is contrary to Parisi's testimony.  The record, therefore, supports Parisi's

10

representation that <u>Spiritual Passports</u> would not be the first book bound using the new equipment.

More importantly, Johnson has not identified any problems with the binding of <u>Spiritual Passports</u> that were caused by the new equipment.  Therefore, based on the factual record presented for summary judgment, Johnson cannot prove his negligent misrepresentation claim to the extent it is based on the new equipment.

### b.   <u>Ability to bind pages without glue traps.</u>

Johnson also contends that Parisi misrepresented Acme's ability to bind <u>Spiritual Passports</u> in an acceptable manner with the pages provided by Capital Offset that did not have glue traps.  Acme contends that Parisi's opinions and promises about binding <u>Spiritual Passports</u> without glue traps were based on his reasonable belief that the alternative binding method, sanding pages, using new glue, and applying double sided tape, would work.[3]  Acme also contends that Johnson cannot show that he reasonably relied on Parisi's statements.

---

[3]Acme relies, in part, on its own answers to interrogatories to provide evidence to show that Parisi reasonably believed the alternative binding method would work.  The interrogatory answers, however, are sworn as true and correct only to the best of Parisi's knowledge and belief.  As such, the interrogatory answers are not competent evidence to support summary judgment. <u>See</u> <u>Perez v. Volvo Car Corp.</u>, 247 F.3d 303, 315-16 (1st Cir. 2001).

Although a promise or opinion is not a statement of fact, such expressions can imply a statement of material fact about the party's ability and intent to perform as promised.  Hydraform Prods. Corp. v. Am. Steel & Alum. Corp., 127 N.H. 187, 201 (1985).  Parisi suggested the alternative binding method to address the problem of binding the book without glue traps.  His representations, whether or not they were promises and opinions, imply that the alternative method would work.

Acme contends that Parisi's opinion that he could bind Spiritual Passports without glue traps was not a misrepresentation because, based on his experience, although glue traps were preferred, books could be bound without them.  In other words, Acme contends that Parisi reasonably believed, when he suggested the alternative binding method, that it would work. Although the record evidence is equivocal, taking the facts in the light most favorable to Johnson, a factual dispute remains as to whether Parisi knew or should have known that the alternative binding method would not solve the problem of binding Spiritual Passports without glue traps.

Johnson relies on various statements by Mazzella to show that Parisi's opinion was not well founded and that Parisi knew that the alternative binding method would not work.  As is explained above, however, Mazzella acknowledged that he is not an

12

expert in bookbinding and that Parisi is an expert in that field. For that reason, Mazzella's opinions about the binding method are not competent to oppose Parisi's opinions.  Further, Mazzella's speculation about what Parisi might have thought when he suggested the alternative binding method would not be competent expert opinion in any case.[4]

Johnson also cites statements made on Acme's website. There, Acme stated:  "When printing books with bleeds that run into the binding margin, as with art or photography books, please leave 3/32" unprinted and unvarnished glue trap in the gutter between signatures.  Without the glue trap, we cannot guarantee that our adhesives will penetrate into the paper fibers and that your book will be sufficiently strong."  Doc. 97-15, at 3.

In his deposition, Parisi explained that glue traps are part of the printing process, that is, an area on each page that does not have ink or varnish.  He testified that Acme suggests to all customers that they use glue traps, but they often do not. Parisi also testified that although some books bound without glue

---

[4]Acme argues that Johnson cannot show that Parisi misrepresented Acme's ability to properly bind <u>Spiritual Passports</u> without expert testimony about the standards and practices in bookbinding.  Although expert testimony would be helpful, it is not so clearly required here that Acme is entitled to summary judgment on that basis.

traps will work, Acme does not guarantee the strength of the binding.[5]

Parisi testified that he suggested using new glue and double-sided tape to fix the binding problem.  Apparently Parisi did not warn Johnson, Cox, or Biancalana that Acme would not guarantee bindings without glue traps nor did he explain, as he did during his deposition, that the new method only addressed the problem as to binding the first and last pages, not the entire book.  The alternative binding method did not solve the weak bindings.  Taking reasonable inferences in Johnson's favor, there is a sufficient factual dispute about Parisi's representations, opinions, or promises to avoid summary judgment.

Acme also contends that Johnson did not rely on Parisi's representations about the alternative binding method.  After Parisi proposed the alternative method, Johnson, Cox, and Biancalana had reservations about it.  Johnson and Stinehour investigated the tape that Parisi suggested, and Cox inspected books bound with the alternative method before allowing the binding process to proceed.  Although the evidence shows that Johnson and his representatives were concerned about Acme's ability to bind Spiritual Passports properly and may not have

_____

[5]Johnson cites some parts of Parisi's deposition that were not included in the exhibits submitted with Johnson's memorandum.

been convinced that the alternative method would work, the course of events suggests that they ultimately relied on Parisi's recommendation to use the alternative method.

Material factual disputes exist about Acme's representations as to its ability to bind Spiritual Passports without glue traps and using the alternative method proposed by Parisi and Johnson's reliance on Acme's representations that preclude summary judgment on Count IV.  Johnson's alternative theory, the alleged misrepresentations about new equipment, does not survive summary judgment.

   2.   Intentional Misrepresentation

Intentional misrepresentation is fraud under New Hampshire law.  Tessier v. Rockefeller, 162 N.H. 324, 332 (2011).  "One who fraudulently makes a misrepresentation for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation."  Id. at 331-32 (internal quotation marks omitted).  Fraud requires proof "that the representation was made with knowledge of its falsity or with conscious indifference to its truth and with the intention of causing another person to rely on the representation."  Id. at 332.  "Fraud must be proved

by clear and convincing evidence." <u>Hair Excitement, Inc. v.
L'Oreal U.S.A., Inc.</u>, 158 N.H. 363, 369 (2009).

Acme contends that Johnson cannot prove, by clear and
convincing evidence, that Parisi intentionally misrepresented
Acme's ability to properly bind <u>Spiritual Passports</u> or that
Johnson justifiably relied on Parisi's promises and opinions.
Johnson argues that Acme intentionally misrepresented when the
new equipment would arrive, that the new equipment would be used
on other books before binding <u>Spiritual Passports</u>, and that the
alternative printing method without glue traps would work.

As is explained above in the context of negligent
misrepresentation, Johnson has not provided sufficient evidence
to show a material dispute that Acme misrepresented the use of
the new equipment or that the new equipment caused any harm.
Although the evidence allows inferences to support a material
factual dispute as to whether Acme negligently misrepresented its
ability to bind <u>Spiritual Passports</u> without glue traps, the
evidence is far from clear and convincing.  Therefore, Acme is
entitled to summary judgment on Count V.


   3.  <u>New Hampshire Consumer Protection Act</u>

The New Hampshire Consumer Protection Act, RSA 358-A:2,
provides: "It shall be unlawful for any person to use any unfair

method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." Practices that violate the Act include "[r]epresenting that goods or services are of a particular standard, quality, or grade, . . . if they are of another."  RSA 358-A:2,VII.  Other commercial activity that is not specifically listed may violate the Act if "the objectionable conduct [] attain[s] a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce."  Axenics, Inc. v. Turner Const. Co., 164 N.H. 659, 676 (2013).

Johnson contends that Acme violated the Consumer Protection Act by representing that it had the ability to bind Spiritual Passports properly when Acme either knew that it could not do so or lacked sufficient information to know whether it could. Specifically, Johnson argues that Acme misrepresented when the new equipment for binding Spiritual Passports would arrive, misrepresented that other books would be bound with the new equipment before Spiritual Passports, and misrepresented that the alternative binding method, without glue traps, would work when Acme did not believe that to be true.  Acme argues that those actions do not support the Consumer Protection Act claim because Johnson cannot show that any representations about the new equipment were untrue or that the new equipment caused any harm

and because the discussions about the alternative binding method occurred in Massachusetts, not New Hampshire.

Johnson's allegations based on the new equipment lack evidentiary support.  Therefore, the Consumer Protection Act claim cannot survive based on those allegations.

With respect to representations about the alternative binding method, RSA 358-A:2 has a territorial requirement that the prohibited practice must be "in the conduct of any trade or commerce within this state."  Precourt v. Fairbank Reconstruction Corp., 856 F. Supp. 2d 327, 343 (D.N.H. 2012).  In the context of misrepresentations allegedly made in violation of the Consumer Protection Act, to be actionable under the Act, those misrepresentations must have been made in New Hampshire.  Id. at 344; see also BAE Sys. Info. & Elecs. Sys. Integration Inc. v. SpaceKey Components, Inc., 2011 WL 1705592, at *4-*6 (D.N.H. May 4, 2011).

Capital Offset is located in New Hampshire, but Acme is located in Massachusetts.  There is no dispute that Acme's alleged representations about binding were made at Acme's facility in Massachusetts.  Therefore, any representations about the alternative binding method were not made "in the conduct of any trade or commerce within this state" as required by RSA 358-

A:2.[6]  Acme is entitled to summary judgment on Johnson's Consumer Protection Act claim, Count IX.

II.  Motion for Summary Judgment on Capital Offset's Cross Claims

Acme seeks summary judgment in its favor on Capital Offset's cross claims for contribution and implied indemnity.  Capital Offset objects.

A.  Contribution

Acme seeks summary judgment on Capital Offset's contribution claim in the event that the court granted summary judgment on all of Johnson's claims against Acme.  As that is not the outcome of Acme's motion, summary judgment on the contribution claim is denied.

B.  Indemnification

In this case, Capital Offset is seeking indemnification for any liability it may have to Johnson on his claim that Spiritual Passports was not bound according to industry standards.  Capital Offset alleges that, based on the contract between Acme and

---

[6]Johnson also argues that the New Hampshire Consumer Protection Act should apply to Acme's representations because the Massachusetts Consumer Protection Act provides the same protection.  That argument is not persuasive in light of the statutory requirements of RSA 358-A:2.

Capital Offset, Acme has an implied obligation to defend and indemnify Capital Offset for any complaints arising solely from binding <u>Spiritual Passports</u>.  Acme seeks summary judgment on the grounds that indemnification is barred by the economic loss doctrine and that no reasonable jury could find that defective binding was the sole cause of Capital Offset's liability.

Under New Hampshire law, a right to indemnification is rarely implied.  <u>Dunn v. CLD Paving, Inc.</u>, 140 N.H. 120, 123 (1995).  When indemnity has been implied in the context asserted by Capital Offset, "'the indemnitor had agreed to perform a service for the indemnitee.'" <u>Id.</u> (quoting <u>Collectramatic, Inc. v. Kentucky Fried Chicken Corp.</u>, 127 N.H. 318, 321 (1985)). Further, the indemnitor must have performed the service negligently, which "cause[d] harm to a third party in breach of a nondelegable duty of the indemnitee." <u>Jaswell Drill Corp. v. Gen. Motors Corp.</u>, 129 N.H. 341, 346 (1987).  The indemnitee must not itself have been negligent beyond a failure to discover the indemnitor's negligently performed service.  <u>Id.</u>; <u>cf.</u> <u>French v. Time Warner Entm't Co. L.P.</u>, 2012 WL 4757879, at *2-*4 (D.N.H. Oct. 5, 2012) (discussing tension between <u>Jaswell Drill</u> and <u>Consol. Util. Equip. Servs., Inc. v. Emhart Mfg. Co.</u>, 123 N.H. 258, 260-61 (1983)).

1.   <u>Economic Loss Doctrine</u>

The economic loss doctrine "preclude[s] contracting parties
from pursuing tort recovery for purely economic or commercial
losses associated with the contract relationship."  <u>Wyle</u>, 162
N.H. at 410 (internal quotation marks omitted).  Capital Offset
seeks implied indemnification from Acme for any liability
incurred on Johnson's claims against Capital Offset which include
breach of contract, negligence, and misrepresentation.

Acme relies on <u>Cooper Power Sys., Inc. v. Union Carbide</u>
<u>Chems. & Plastics Co., Inc.</u>, 123 F.3d 675, 684 (7th Cir. 1997),
to support its theory that implied indemnification is barred by
the economic loss doctrine.  There, the court held that "[t]he
economic loss doctrine dictates that implied indemnity claims of
the sort claimed by [the cross-claim plaintiff] have no place in
a suit for commercial losses governed by the U.C.C."  <u>Id.</u> at 684.
The court further explained that under Ohio law implied
indemnification was used to recover what another party should
have paid and in that case the cross-claim defendant was not
liable for those losses.  <u>Id.</u>  The application of <u>Copper Power</u> to
this case is far from clear.  <u>See also</u> <u>Bethlehem Steel Corp. v.</u>
<u>Chicago E. Corp.</u>, 863 F.2d 508, 510-11 (7th Cir. 1988) (noting
that implied indemnification was a possible exception to the
economic loss rule); <u>Memphis-Shelby County Airport Auth. v. Ill.</u>

<u>Valley Paving Co.</u>, 2006 WL 3041586, at *4 (W.D. Tenn. Oct. 26, 2006) (holding that economic loss doctrine does not bar implied indemnification).

In addition, Acme's theory appears to contradict New Hampshire's law relating to implied indemnification.  Acme contends that the economic loss doctrine applies because Capital Offset seeks compensation for economic losses allegedly caused by Acme's performance under their contract.  That characterization is not entirely accurate, however.  Capital Offset seeks compensation for damages it may have to pay to Johnson allegedly caused by defects in the binding of <u>Spiritual Passports</u>.

Indemnification is always sought as compensation for economic losses, which are the damages paid to a third person, whether the underlying loss is economic or the result of physical injury or damage to property.  If the economic loss doctrine applied as Acme urges, it would bar all indemnification claims when the potential indemnitor provided services to the indemnitee under a contract.  That result appears to be contrary to the New Hampshire cases describing implied indemnification.

2.  <u>Capital Offset's Negligence</u>

Acme contends that Capital Offset is not entitled to indemnification because Capital Offset was negligent in printing

Spiritual Passports without a glue trap, which caused at least
some of the problems with the bindings.  Without citing evidence
in the record, Acme states that if a jury found the bindings to
be defective, the "jury would have no choice but to also find
that Capital Offset's failure to use glue traps was somewhat
responsible for causing the defects, based on the evidence."
Doc. 87, at 24.

     In response, Capital Offset acknowledges the opinions of
Paul Parisi and Robert DeCristoforo, from Acme, that the binding
problems were caused by the lack of a glue trap.  Capital Offset
challenges the opinions based on counsel's theories that the
bindings would have to be tested to prove Parisi's and
DeCristoforo's opinions and that the existence of some
nondefective bindings without glue traps refuted the opinions.
Capital Offset, however, did not provide expert testimony to
counter the opinions of Parisi and DeCristoforo about the effect
of the lack of glue traps on the quality of the binding.
Counsel's theories, therefore, are not sufficient to undermine
the opinions.

     Capital Offset also cites testimony by Parisi, DeCristoforo,
and Capital Offset's employee, Aaron Constant, that some of the
problems could have been caused by too much or too little glue
and other binding issues.  While that testimony may support the

possibility of additional problems with the bindings, the testimony does not exclude the lack of glue traps as part of the cause.  Capital Offset also cites Jay Stewart's deposition testimony, stating that Capital Offset did not consider using a glue trap on <u>Spiritual Passports</u>, that they do not use glue traps on hardcover books, and that he thought the books were well bound.  That testimony does not appear to support Capital Offset's claim.

In addition, Capital Offset charges that "there is no evidence that Acme Bookbinding sent only those books approved for shipment to plaintiff, to Susan Cox, or to Texas."  Doc. 98, at 5.  Asserting that Acme did not keep records of how many books were disposed of or set aside for salvage and that twenty-one books with problems have been identified during this litigation, Capital Offset infers that Acme improperly shipped both approved and unapproved books.  Capital Offset does not explain, however, what significance the shipping issues, if any, would have for its indemnification claim, and the court will not speculate about what argument Capital Offset may have intended.  See <u>Higgins v. New Balance Athletic Shoes, Inc.</u>, 194 F.3d 252, 260 (1st Cir. 1999); <u>United States v. Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990).

As Acme explains, implied indemnification is not available if Capital Offset contributed to cause the binding problems.

Capital Offset, as the party with the burden of proof on the indemnification claim, did not provide evidence to show that the lack of a glue trap did not contribute to the problems with the bindings.  See OneBeacon Am. Inc. Co. v. Commercial Union Assurance Co. of Canada, 684 F.3d 237, 241 (1st Cir. 2012). Therefore, Acme is entitled to summary judgment on Capital Offset's implied indemnification claim.


Conclusion

For the foregoing reasons, Acme's motion for summary judgment (document no. 87) is granted as to Counts V and IX of Johnson's complaint and as to Count II of Capital Offset's cross claims.  The motion for summary judgment is denied as to Count IV, although the claim is limited by summary judgment to the theory that Acme negligently misrepresented that the alternative binding method without glue traps would work.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

September 25, 2013

cc:  Jennifer Turco Beaudet, Esquire
     Lawrence F. Boyle, Esquire
     Matthew Joseph Delude, Esquire
     Elsabeth D. Foster, Esquire
     Thomas J. Pappas, Esquire
     Mark W. Shaughnessy, Esquire
     William N. Smart, Esquire

25